Judge McMahon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

REBECCA ROMERO,

                Plaintiff,

   - against -

BNP PARIBAS,

                Defendant.

------------------------------------------------------x

07 CIV 9302

07 Civ.    (    )

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

        Plaintiff Rebecca Romero ("Romero" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant BNP Paribas ("BNP" or "defendant") as follows:

### NATURE OF THE ACTION

        1.    Plaintiff brings this action to remedy unlawful interference with the exercise of her rights, and discrimination and retaliation against her for such exercise, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); and, to remedy discrimination in employment on the basis of her sex in the terms, conditions and privileges of employment, in violation of the New York State Human Rights Law, Executive Law § 296 et seq. (the "Human Rights Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law"); and for unlawful retaliation on the basis of her engaging in activities protected by the Human Rights Law and the City Law.

        2.    Plaintiff seeks legal and equitable relief, liquidated damages and other appropriate relief pursuant to the FMLA; and, injunctive and declaratory relief, compensatory and

247860 v1

punitive damages, and other appropriate legal and equitable relief pursuant to the Human Rights Law and the City Law.

## JURISDICTION AND VENUE

3.   The Court has jurisdiction over the FMLA claim pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

4.   The Court has jurisdiction over the Human Rights Law and City Law claims pursuant to 28 U.S.C. § 1367; or, in the alternative, pursuant to 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

5.   Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel.

6.   Plaintiff has timely filed a charge of discrimination against defendant with the United States Equal Employment Opportunity Commission (the "EEOC") on September 22, 2007. When plaintiff receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). The facts set forth are those relevant to that claim as well, and there will therefore be no prejudice to defendant by this procedure.

7.   Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the unlawful practices complained of herein occurred within the Southern District of New York.

## PARTIES

8. Plaintiff Romero, a woman of Hispanic ancestry, is a resident of the State of Florida, and was employed by BNP from March 2003 until the involuntary termination of her employment on May 9, 2007.

9. Upon information and belief, defendant BNP is a French banking and financial services corporation headquartered, and with its principal place of business, in France. It is an "employer" within the meaning of the FMLA, the Human Rights Law and the City Law.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

10. Plaintiff first worked for BNP from 1996 to 1999, as a Credit Analyst in commodity derivatives.

11. In 1999, plaintiff left for a better opportunity with the Bank of Montreal.

12. In 2003, Jean-Marc Bonnefous ("Bonnefous"), Managing Director and Global Head of Commodity Derivatives, recruited plaintiff to re-join BNP as a Vice President. Plaintiff was subsequently promoted to Director.

13. When plaintiff returned to BNP in March 2003, many of her clients followed her from Bank of Montreal to BNP.

14. When plaintiff returned to BNP in 2003, Marc Fontaine ("Fontaine"), was her immediate supervisor, and he reported in turn to Bonnefous. Although plaintiff did not report directly to Bonnefous, she had regular contact with him and he made all major decisions affecting her group.

15. When plaintiff returned to BNP in 2003, there were about ten people on the commodity derivatives desk. She was one of two women on the desk. One of the men on the desk was Peter Carpenter ("Carpenter"), a Director.

16. From the time of plaintiff's return in 2003 until Carpenter resigned in or about April 2006, Carpenter made offensive comments about women and about various racial and ethnic groups, including Hispanic people.

17. In 2004, plaintiff had a very successful year. Once she became successful, Carpenter began to direct sexist comments directly toward her, such as making comments about her attire and appearance, and repeatedly suggesting that she was successful because she was sleeping with her clients. He also made sexist comments about her to others in her presence. For example, Carpenter frequently referred to plaintiff as a "bitch," said she did not belong on the desk, and said that she was not qualified.

18. In 2005, Carpenter's improper conduct toward plaintiff intensified, and became more frequent.

19. Many of Carpenter's offensive comments to plaintiff and about her were made in the presence of Fontaine. Fontaine took no action.

20. In 2004 and 2005, plaintiff repeatedly complained to Fontaine about Carpenter's behavior. Fontaine responded by telling plaintiff that Carpenter was just intimidated by her, and that she should ignore him.

21. In or about September 2005, Bonnefous was transferred from New York to London, but continued to have responsibility for plaintiff's group.

22. In the fall of 2005, plaintiff went to Human Resources ("HR") and met with Barbara Gorman ("Gorman"). She told Gorman about the hostile work environment Carpenter had created. Gorman said she would look into the matter.

23. Plaintiff never heard back from Gorman, or anyone else, about any action being taken by BNP in response to her complaint of sexual harassment.

24. After plaintiff complained to HR, her complaint became openly known on the desk. Carpenter made comments such as telling people they should not talk to her because she would report them to HR. In addition, Carpenter continued to make offensive comments to and about plaintiff, and about women and various racial and ethnic groups. Fontaine was aware of Carpenter's conduct, and did nothing to stop it.

25. After plaintiff complained to HR, Fontaine's treatment of plaintiff changed dramatically. Prior to her complaint, while Fontaine had done nothing to stop the hostile work environment, he had acted cordially and professionally toward her. After her complaint, Fontaine became openly hostile toward her. Fontaine became very critical of plaintiff and treated her with contempt.

26. Carpenter resigned in or about April 2006.

27. Bonnefous' employment was terminated in or about April or May 2006. At that time, Fontaine, who was by that time a Managing Director, was promoted to Global Head of Energy Flow Marketing.

28. Although plaintiff had a very strong year in 2006, Fontaine continued to treat her with hostility. He questioned her competence in front of others with no basis, berated her in front of others, and treated her in a condescending manner. He did not engage in such behavior toward anyone else on the desk. In meetings, although plaintiff was the second-highest

ranking person in marketing, after Fontaine, he ignored her and showed greater respect and deference to those who were junior to her.

29.  In September 2006, Fontaine said that plaintiff's group was on target to meet its performance benchmarks.

30.  In early February 2007, Fontaine told plaintiff that her bonus for 2006 was going to be $225,000 and that she would not receive any raise or stock award. Although she had achieved her second-best year of performance, this was her lowest full-year bonus ever at the firm. In comparison, for 2005, which had been a bad year for the whole group, her bonus was still higher, at $272,000. For 2004, which was also a strong year, her bonus was $397,000. Moreover, every year prior to 2007 plaintiff had received a raise and stock award.

31.  When Fontaine told plaintiff about her bonus and that she would not be receiving a raise or stock, she told him she found it shocking. He said, "OK," and said nothing more. He did not provide any explanation for this drastic cut to plaintiff's compensation.

32.  Although plaintiff continued to perform well in the first two months of 2007, she believed that Fontaine was trying to make her quit by cutting her compensation.

33.  Dealing with Carpenter's and Fontaine's harassment had been very stressful for plaintiff. When Fontaine signaled that plaintiff was no longer wanted at BNP, the stress became unmanageable. She sought treatment from a psychiatrist, who recommended that she take a medical leave of absence.

34.  In late February 2007, plaintiff met with Shellie Murawski ("Murawski") in BNP's benefits department, which, upon information and belief, was part of HR. Plaintiff told Murawski about the situation, and Murawski subsequently provided plaintiff with forms for Family and Medical Leave Act ("FMLA") leave and short-term disability. The only requirement

247860 v1

6

Murawski identified as necessary for plaintiff to get approved FMLA leave was that she get an FMLA form signed by her manager, Fontaine. Plaintiff told Murawski that she was taking the leave because of Fontaine's harassment, and asked that Murawski present the form to him instead, which Murawski agreed to do. Murawski did not inform plaintiff of any other requirements for approval of her FMLA leave request, and provided plaintiff with separate forms and instructions on applying for short-term disability benefits. Murawski did not ask plaintiff any questions about Fontaine's harassment.

35. Plaintiff subsequently requested FMLA leave that was expected to last from March 5, 2007 to May 28, 2007. Plaintiff's FMLA leave was approved on March 1, 2007, when Fontaine signed the FMLA form requesting leave. Karen Pappas ("Pappas"), Director of HR, also signed the form approving plaintiff's leave on March 1, 2007.

36. Plaintiff called Murawksi after sending her the FMLA form and asked if there was anything else she needed to do with regard to her FMLA leave. Murawski said that plaintiff did not have to do anything else to obtain FMLA leave, and told plaintiff that, with respect to short-term disability coverage, she needed to submit the disability forms to the insurance company.

37. In requesting and taking FMLA leave, plaintiff relied upon her statutory right under the FMLA to retain employment and be returned to the same or equivalent position upon her return.

38. While plaintiff was on FMLA leave, Pappas sent her a letter falsely stating that her leave was unapproved, stating that BNP needed certification from plaintiff's physician, and asking plaintiff to get in touch with Pappas. The letter was silent as to each of the following: what information should be included in the physician certification, the deadline for submission of

the physician certification, and the consequences for failing to provide the physician certification.

39. On Friday, April 20, 2007, promptly upon receipt of the letter, plaintiff telephoned Pappas and left a message asking what information was required from her physician. Plaintiff provided Pappas with her email address and fax number so that Pappas could send her any additional forms that needed to be completed. Pappas then called back and left a message asking plaintiff to call back on the following Monday.

40. On April 23, 2007, plaintiff twice attempted to contact Pappas by telephone, but to no avail.

41. Pappas never provided plaintiff with the information about the physician certification, nor did she ever inform plaintiff of any deadline for submitting the information or of any consequences for failure to submit it.

42. By letter dated May 9, 2007, Pappas told plaintiff that her employment was terminated.

43. After she was fired, plaintiff learned that Fontaine re-hired Carpenter to replace her.

44. BNP interfered with plaintiff's exercise of her right to FMLA leave, and retaliated against her for taking such leave, by terminating her employment while she was on approved FMLA leave.

## FIRST CAUSE OF ACTION

## (FMLA)

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 of this Complaint with the same force and effect as if set forth herein.

46. By the acts and practices described herein, defendant has interfered with, restrained, and denied plaintiff, and retaliated against her for exercising, her rights under the FMLA, in violation of the FMLA, 29 U.S.C. §§ 2612(a), 2614(a)(1), and 2615(a)(1).

47. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

## (EXECUTIVE LAW - DISCRIMINATION)

48. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 47 of this Complaint with the same force and effect as if set forth herein.

49. Defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Human Rights Law.

50. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

## (EXECUTIVE LAW - RETALIATION)

51. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-50 of this Complaint as if set forth herein.

52. By the acts and practices described above, defendant has retaliated against plaintiff for her opposition to unlawful employment practices in violation of the Human Rights Law.

53. Plaintiff is now suffering irreparable injury and monetary damage from defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## FOURTH CAUSE OF ACTION

## (CITY LAW - DISCRIMINATION)

54. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 53 of this Complaint with the same force and effect as if set forth herein.

55. Defendant discriminated against plaintiff in the terms and conditions of her employment based on her sex in violation of the City Law.

56. In taking the above-described discriminatory actions, defendant acted with malice and reckless indifference to plaintiff's rights under the City Law.

57. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

## (CITY LAW - RETALIATION)

58. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-57 of this Complaint as if set forth herein.

59. By the acts and practices described above, defendant has retaliated against plaintiff in violation of the City Law.

60. Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

61. Plaintiff is now suffering irreparable injury and monetary damage from defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the FMLA, Human Rights Law, and the City Law;

(b) enjoining and permanently restraining these violations of the FMLA, the Human Rights Law, and the City Law;

(c) directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory treatment of her, and making her whole for all

earnings and other benefits she would have received but for defendants' discriminatory and retaliatory treatment, including but not limited to wages, pension, and other lost benefits;

  (e)  directing defendant to pay plaintiff an additional amount as liquidated damages for violations of the FMLA;

  (f)  directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

  (g)  directing defendant to pay plaintiff additional amounts as punitive damages;

  (h)  awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

  (i)  awarding plaintiff the costs of this action, together with reasonable attorneys' fees, as provided by the FMLA, and by the City Law; and

  (j)  awarding such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
October 17, 2007

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: _____
Anne L. Clark (AC 6456)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300